Marvin SHERWIN, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 18200.

United States Court of Appeals
Ninth Circuit.

June 11, 1963.

Rehearing Denied Aug. 8, 1963.

John V. Lewis and Richard H. Foster, San Francisco, Cal., for appellant.

Cecil F. Poole, U. S. Atty., and David R. Urdan, Asst. U. S. Atty., San Francisco, Cal., and Lawrence K. Bailey, Atty., Dept. of Justice, Washington, D. C., for appellee.

Before POPE, BARNES and JERTBERG, Circuit Judges.

POPE, Circuit Judge.

The appellant in this case was convicted on all six counts of an indictment

which charged him with offenses under 26 U.S.C. (I.R.C.1954) § 7201 and 26 U.S.C. (I.R.C.1954) § 7206(1).

The first three Counts, drawn under § 7201, were substantially identical except that Count 1 charged willful and knowing attempt to evade and defeat a large part of the income tax due and owing by the defendant and his wife for the calendar year 1954; Count 2 made a similar charge with respect to the tax for the calendar year 1955; and Count 3 alleged the attempt to evade and defeat the income tax due and owing for the calendar year 1956.[1] Counts 4, 5 and 6, referring to the income tax returns for the same years 1954, 1955 and 1956, alleged that the defendant did willfully and knowingly make and subscribe and file and caused to be filed joint income tax returns for those respective years in his name and the name of his wife, verified as specified in the statute, which returns the defendant did not believe to be true and correct as to every material matter in that the defendant stated that the income of himself and his wife were in certain specified amounts, whereas he had additional income which he failed to disclose on the return.[2]

Upon appeal, although appellant specifies error on account of the court's denial of a motion for acquittal, no portion of his briefs is devoted to an argument that the evidence was insufficient to warrant

1. The language in Count 1 was as follows: "On or about July 15, 1955, in the Northern District of California, Southern Division, Marvin Sherwin, defendant herein, who during the calendar year 1954 was married, did willfully and knowingly attempt to evade and defeat a large part of the income tax due and owing by him and his wife to the United States of America for the calendar year 1954 by filing and causing to be filed with the District Director of Internal Revenue at San Francisco, California, a false and fraudulent joint income tax return on behalf of himself and his wife wherein it was stated that their taxable income for the calendar year 1954 was $21,221.01 and the amount of tax due and owing thereon was $5,743.60, whereas, as he then and there well knew, their taxable income for the calendar year 1954 was $33,993.64 upon which taxable income there was due and owing to the United States of America an income tax of $11,396.82."

Count 2, relating to defendant's tax for the year 1955, alleged that the return stated the taxable income for himself and wife to be $20,796.96, and the tax thereon $5,582.84, whereas the true taxable income for that year was $32,664.03 and the tax due thereon $10,732.01.

The third count contained similar allegations with respect to the calendar year 1956 in which the taxable income of defendant and his wife was $35,354.28, on which the tax due was $12,007.37, instead of income as shown on his return of $22,986.79, disclosing a tax due of $6,414.98.

2. The form of these allegations in the last three counts of the indictment is indicated by the language in the fourth count which was as follows: "On or about July 15, 1955, in the Northern District of California, Southern Division, defendant, in violation of Title 26, United States Code, § 7206(1), did willfully and knowingly make and subscribe and file and cause to be filed with the District Director of Internal Revenue at San Francisco, California, a joint income tax return for the calendar year 1954, in his name and in the name of his wife, Georgia Sherwin, which was verified by the defendant by a written declaration that it was made under the penalty of perjury which said joint income tax return for the calendar year 1954 the defendant did not believe to be true and correct as to every material matter in the said joint income tax return for the calendar year 1954, in that the defendant stated that the income of himself and his wife for the calendar year 1954 was as follows:

| | |
|---|---|
| County of Alameda | $9,250.00 |
| State of California | $7,500.00 |
| Chip Steak Company | $5,520.00 |
| Other income | $2,505.56 |

whereas, as he then and there well knew, he had additional income amounting to $12,801.45 which he failed to disclose on his and his wife's said joint return."

The fifth and sixth counts were in similar form except that these referred to the tax returns for the years 1955 and 1956 respectively and recited differing amounts of additional undisclosed and unreported income for those two years.

the verdict of the jury insofar as the first three counts are concerned.[3]

■ It appears to us to be too plain for argument that in each of the years involved the appellant filed income tax returns which omitted a substantial number of items of income received, and this under circumstances which warranted the jury's finding that the omissions were willful attempts to evade or defeat the taxes owing by him, that is to say, that the defendant had the specific intent required by Spies v. United States, 317 U. S. 492, 63 S.Ct. 364, 87 L.Ed. 418, and as defined in Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150.

During the years here in question the appellant was a Judge of the Superior Court of the State of California for the County of Alameda. In 1955, when he filed his return for 1954, he was 53 years of age. He was a graduate of the law school of the University of California at Berkeley, Class of 1926. He practiced law in Oakland from 1926 until he went on the bench in the Fall of 1953. For eight years prior to this he was a member of the Legislative Assembly of the State of California and during the latter portion of that time he was a member of the Assembly's Revenue and Taxation Committee. He had no special experience in tax matters as an attorney and he testified that the Assembly Committee, of which he was a member, relied on experts for technical advice with respect to tax law. He knew the difference between ordinary income and capital gains and he knew that he was making his returns upon a cash receipts basis.

From the year 1945 on appellant was associated with a Mr. Tarman in certain real estate ventures. About 1948, Tarman, Sherwin and one Bechtel organized a corporation whose stock they owned and whose business was that of constructing housing projects and building houses upon subdivisions located in Alameda and Contra Costa Counties. In connection with the operation of this corporation, referred to as the Bechtel corporation, a number of other corporations were formed by these parties which were used to carry out and facilitate the main business of the Bechtel corporation itself. These will be referred to hereafter.

It thus appears that the defendant was a man of parts and experience in business activities and concerns. His law practice was at times substantial, although he testified that it diminished somewhat in later years when his activities in connection with the Tarman partnership and the Bechtel corporation increased. Notwithstanding this, Sherwin kept no regular books of accounts. He noted his income and expenses in his check book, and cash receipts not deposited would be noted on his check stubs. In each of the three years here in question, Sherwin, for the purpose of aiding in the preparation of his income tax return, prepared a work sheet from his check stubs showing his income during the year in question and his deductible expenditures. He made a summary of these which he gave to one Joyce who was a public accountant and known to Sherwin because he was employed by Tarman and by the partnership of Tarman and Sherwin in keeping accounts and in making tax returns. Joyce prepared the 1954, 1955 and 1956 income tax returns for the defendant from work sheets and summaries furnished him by the defendant. Joyce also had knowledge of the partnership income tax returns for the years in question and inserted in the tax returns prepared by him at the appropriate places Sherwin's share of the partnership income for the appropriate year.[4]

The evidence shows, without contradiction, that the tax return for the year

3. This is aside from an argument hereafter mentioned to the effect that certain action of the Internal Revenue Service taken in 1954 or 1955, in allowing a claim for refund relating to earlier years amounted to an adjudication that defendant was a dealer in corporations, that this determination was final and binding upon the trial court here, and required a finding of not guilty.

4. The return for 1954 also showed income from a partnership known as Cheney Bros. Chip Steak Co.

1954 omitted income from some nine different sources. Some of those items of income were substantial in amount, and all of them were of such character that whether entered upon Sherwin's stubs or not, it would be most unlikely that he would forget them. They came to him through 27 items of payment and none of those 27 items found their way to the tax returns.

The nine sources of omitted income are shown in the following table:

| | |
|---|---|
| Ayer (5 checks) | $ 2,708.32* |
| Beckwith Estate (1 check) | 911.86* |
| Beresa (1 check) | 250.00 |
| Beresa credit card, Shell Oil | 669.78* |
| Chip Steak (1 check) | 3,833.07* |
| Culp (4 checks) | 682.26 |
| McGee (12 monthly payments) | 245.41* |
| Nichols, Richards, et al. (2 checks) | 2,807.71* |
| Tarman (1 check) | 1,500.00 |
| | $13,608.41 |

The items marked with an asterisk were stipulated to be omissions of properly taxable income for that year; the others were admitted to be properly taxable items during the course of appellant's testimony.[5]

In Holt v. United States, 9 Cir., 272 F. 2d 272, 274, we held that evidence of a consistent pattern of not reporting large amounts of income was sufficient to support an inference of willfulness.[6]

There was other significant evidence having bearing upon the question of willfulness. In September, 1957, an Internal Revenue agent who had been interviewing Sherwin in connection with an investigation of the latter's tax returns for these years, requested Sherwin to bring to him certain records disclosing his receipts and disbursements. Sherwin brought in some bank statements from the Central Bank of Oakland and from the Oakland Bank of Commerce; he told the agent that the Central Bank account was "what he called a trustee account for his law practice" and the Oakland Bank of Commerce account was used for his personal household matters. On September 6, 1957, in a telephone conversation with Sherwin, the agent discussed his bank accounts again and made arrangements for him to come in later with more of his records.

5. The Ayer checks were payments received for attorney's fees earned prior to the appellant's judicial appointment; the Beckwith estate check represented an executor's fee; the Beresa check was a check for legal services performed prior to the judicial appointment; the Beresa credit card item represents sums of oil and gasoline purchases by defendant on a credit card furnished him and paid for by Beresa Corporation; the Chip Steak check was for payment of legal services rendered in prior years; the Culp and the Nichols, Richards payments were on account of a division of legal fees in cases which Sherwin had referred to other lawyers prior to his appointment as Judge; the $1500 check from Tarman was, according to the testimony of Tarman's son who wrote the check, a payment for legal services previously performed. Sherwin admitted that he got the check but his recollection was uncertain as to just what the check represented. The McGee payments were of interest.

6. The opinion relied upon and quoted from Holland v. United States, 348 U.S. 121, 139, 75 S.Ct. 127, 99 L.Ed. 150, as follows: "A final element necessary for conviction is willfulness. The petitioners contend that willfulness 'involves a specific intent which must be proven by independent evidence and which cannot be inferred from the mere understatement of income.' This is a fair statement of the rule. Here, however, there was evidence of a consistent pattern of underreporting large amounts of income, and of the failure on petitioners' part to include all of their income in their books and records. Since, on proper submission, the jury could have found that these acts supported an inference of willfulness, their verdict must stand." Other cases which resemble this one are United States v. Alker, 3 Cir., 260 F.2d 135, 148, ("consistent understatement is evidence of willfulness"), United States v. Lindstrom, 3 Cir., 222 F.2d 761, 763, (failure of business man taxpayer to disclose receipts to his accountant).

The agent's testimony was "But I also asked him at this time in the telephone conversation whether he had any bank accounts other than the Central Bank account and the Oakland Bank of Commerce account, which he told me he had, and he said he had no other bank accounts. And I had indicated to him that there was some indication he might have had an account in Sacramento and he said, no, he did not. I did not know that he had a bank account in Sacramento, and I asked him, and I asked him if he had a bank account in Sacramento and he said, no, he never had one there."

Sherwin's statement to the agent was proven to be false for the evidence shows that he had other bank accounts and some of those bank accounts not disclosed to the agent were the ones in which the unreported receipts were deposited. Among these were an account of "Beresa Corp. Sherwin Trustee" in the Bank of America at Oakland; and another in the name of "E. O. Thompson, Trustee", in the American Trust Company of Oakland. He also had two accounts in Sacramento, one a Tarman & Sherwin Partnership account, and one which Sherwin described as a "temporary account" in the year 1953 in American Trust Company in Sacramento. He also had what he called a "temporary account" in the Crocker Bank in Oakland.

Sherwin explained the account in the name of "E. O. Thompson, Trustee", which was his own account and used for his funds only, as having been put in that name for protection against his creditors who he thought might try to attach his bank accounts. The same reason is indicated for his use of the account in the name of "Beresa Corp. Sherwin Trustee". Whatever his reason for maintaining these accounts this was no justification for his attempts to conceal them from the revenue agent.

In Clark v. United States, **8 Cir.,** 211 F.2d 100, 104, the appellant's returns had been prepared by an accountant who had not been given access to the records; the figures used by the accountant had been compiled by the appellant himself. When the revenue agent inquired about the appellant's bank account he gave him only one bank name and failed to give him the names of three other banks in which he had accounts. The court said: "All of these items of evidence were clearly relevant and sufficient to warrant the jury in making an inference of willfulness." [7]

The evidence with respect to the 1955 and 1956 returns followed a similar pattern. The number and total amount of the omitted income items for 1955 was substantially the same as those for 1954, if we view the testimony, as we must, in the light most favorable to the Government.[8]

7. It is well settled that a defendant's subsequent false statements about matters in litigation are relevant and admissible as bearing upon the intent and willfulness and consciousness of wrongdoing. They are like admissions by conduct. See McCormick On Evidence, § 250.

8. In the 1955 return there was omitted $640.06 on account of appellant's Beresa credit card; $774.85 received from Culp under circumstances similar to those described in connection with the 1954 return; $838.66 in attorney's fees received from others; and $500 attorney fee received from Tarman (Sherwin testified he thought this was either a gift or distribution of partnership funds); $9350 in commissions received through one Wright, additional amounts of partnership income from Cheney Bros. Chip Steak Co., and a joint venture with Culp, further interest from McGee and two other interest items. Sherwin testified that he regarded the $9350 from Wright as non-taxable income; he claimed this amount was compensation for losses sustained on the bankruptcy of the Bechtel corporation hereafter referred to.

The omitted items from the 1956 return were similar credit card payments, divisions of fees from Culp, partnership income from Cheney Bros. Chip Steak Co., interest from McGee, and dividends from a Melfort Company.

The evidence also showed an omitted item represented by receipt by Sherwin of stock in Anderson-Heights Water Company. This was a utility company serving water to a subdivision in Anderson,

We have thus discussed the question of the sufficiency of evidence to sustain the verdict as to the first three counts of the indictment, not because the appellant's brief and oral argument contained any serious contention either that there were not omitted items of income in each of these three years, or that there was an insufficiency of evidence to prove willfulness and a specific intent to evade or defeat the tax, but primarily to furnish a background for discussion of other contentions seriously urged by the appellant and with which we shall now proceed to deal.

Appellant contends that the court erred in its treatment of the Anderson-Heights water stock. The contention here takes two forms: first, it is urged that the court should have granted defendant's motion to strike all the testimony with respect to that stock. This contention is based upon the argument that there was no proof that the stock had any value in excess of the $4,000 loan which was owed by Beresa to appellant. We think that there was evidence sufficient to show such value.

The witness Wright testified that he had purchased some of this stock,—$25,-000 worth. Based upon the price paid by Wright, appellant's 262½ shares of that stock would have a value of $14,000. The Government's technical advisor witness testified that in arriving at the $10,000 value attached to this Anderson Water Company stock as being the value received by Sherwin on account of his fees, the $4000 loan was deducted from the

$14,000 value of the stock leaving the balance of $10,000, and that this was "considered as the income from fees in satisfaction of the claim for $13,250."

Sherwin's own testimony discloses that he attached substantial value to that stock. He testified that he had possession of the stock prior to his agreement to release his two claims. He testified as follows: "In other words, the stock was first in my possession as security for the payment of this obligation, and then in August—yes, August of 1956—Mr. Bechtel asked me to accept the stock and cancel the indebtedness. It had been explained that would facilitate his settlement with Beresa. Q. That indebtedness was $13,-250 legal fees and $4,000 advances? A. Correct. Q. You received the stock and cancelled that indebtedness? A. Well, as I explained, I already had the stock, but I did cancel the indebtedness and got the stock."

It is argued that since the debt was owed by the Beresa Company and that at the time Beresa was in very serious financial difficulties, Sherwin's willingness to take this stock and cancel the indebtedness was not significant since under the circumstances he would normally be satisfied with whatever he could get. We think that it cannot be said that there was any justification for an argument that no value beyond the $4,000 was established or proven.

The second aspect of the argument with respect to the Anderson-Heights water stock is based upon an alleged error in the court's instruction with respect

California. In 1956 Sherwin received 262½ shares of that company's stock. The evidence tended to show that at that time the Beresa Company owed Sherwin $4000 for money loaned and Sherwin had rendered a bill to Beresa for $13,250 for legal services performed prior to the time he became a judge. The evidence indicated that these shares were issued to Sherwin to liquidate the bill for money owed and the bill for legal fees, and the stock was transferred from Beresa for that purpose.

The Government's testimony was to the effect that the stock thus received by

Sherwin had a value of $14,000 and deducting the $4000 represented by the loan, Sherwin was charged with having received the equivalent of $10,000 on account of legal fees through the receipt of this stock. Sherwin's version of the transaction is that he did not consider the receipt of the stock as a taxable income; that he considered it a security transaction. If we accept the Government's evidence, as the jury may well have done, the items of unreported income for 1956 which should have been reported made a total of $12,580.19.

to the value of this stock. The court's instruction defined fair market value and listed some of the bases from which fair market value might be ascertained. The only objection made with respect to the instruction as given was to the effect that the court should have added an instruction to the jury that they must find that the Anderson-Heights water stock had a value in excess of $4,000.[9] The argument seems to be that the jury would be apt to be confused with respect to the value for income purposes to be attached to this stock if they were not specifically told that from any value which the stock had they must first deduct the sum of $4000, the amount of indebtedness which the receipt of stock was intended to satisfy.

■ We think it is self-evident that before Sherwin could be said to have received income from this stock it would have to be shown to have had a value in excess of $4,000. We are unable to perceive how the jury could be confused about this and we cannot say that failure to add to the instruction the language referred to in the last footnote could be in any manner prejudicial to the defense.

During the course of the trial the question arose as to whether certain sums of money and the Anderson-Heights stock received represented compensation for legal services performed by Sherwin.[10] Appellant asserts that prejudicial error was committed when the Government elicited testimony tending to show that these items were payments of legal fees. He asserts that these sums were received in 1954 and later when the defendant was on the bench; that all of this testimony about their being legal fees was designed to show that he was an unethical person;

and that the prosecution undertook by this to insert "inflammatory, improper and erroneous issues in the case."

■ We are unable to observe any prejudice in the respect here mentioned; there was no claim that the services for which the fees were paid were rendered by Sherwin after he was appointed a judge. The Government's contention with respect to all the legal fees claimed to have been received and not reported was that these were fees for legal services prior to the defendant's appointment.

Obviously when the Government was confronted with claims by the defendant that certain sums received were not income reportable by him, it was permissible for the Government to develop its theory as to the nature of the payments. Furthermore, when this question was raised during the trial the court cautioned the jury that the only issue involved was what was defendant's income, and it stated, in substance, that "these other matters" were relevant only to the question of what income defendant received. And upon final charge to the jury the court again cautioned the jury that defendant was not on trial for receiving fees; that a judge may engage in private business, neither the law nor the canons of judicial ethics forbids that, and that no unfavorable inference should be drawn from the fact that the defendant, after becoming a judge, received compensation for legal work done prior to taking office. We find no basis for complaint with respect to the proof of the legal fees.

We come next to the two related specifications of error which referred to "income from the Tarman-Sherwin Partnership". It is asserted first that the court

9. The objection contained the following statement on the part of defendant's counsel: "Now, because of the fact that the jury might become confused as to that $4000 I would request the Court to specifically instruct the jury that they may not find that this transaction represents taxable income unless they find that the value of the property is over $4000."

10. At one time in 1955 Sherwin received a $500 check from Tarman's son and in

1954 he received a $250 check from Beresa. Sherwin was claiming that some of these items did not constitute reportable income. He claimed that the $500 check from Tarman's son was a partnership withdrawal. He made a similar claim with respect to the $1500 Tarman check received in 1954; and as we have indicated, he asserted that the Anderson-Heights Water Company stock was a security transaction not reportable and not a taxable item.

improperly admitted evidence that there was unreported income from that partnership. This specification is not as specific as it might be for there were two places in the record at which there was reference to unreported income from this partnership.

The first instance was during the cross-examination of the witness Neilands, an internal revenue agent, who had audited the partnership returns of that partnership. Neilands was called as a witness for the defense; just why is not entirely clear. Near the end of the cross-examination of this witness Government counsel asked the following question: "Q. Now in the audit of the Tarman-Sherwin partnership, did your audit reveal that there was any additional unreported income to the partnership?" To this the witness answered: "Yes". Government counsel then elicited the following testimony: "Q. But there was additional partnership income? A. There was considerable deficiency, according to my report, which means that there was considerable additional income in the Tarman-Sherwin report over that which had been reported on the partnership return." It would appear that this testimony was irrelevant and that an objection to these questions would be properly sustained. However, there was no objection made.

▮ There was other evidence relating to the unreported income from the Tarman-Sherwin partnership. This also was received without objection.[11] Since none of this evidence, that additional income to the partnership was chargeable to Sherwin because the partnership received it, was objected to, we cannot find reversible error in respect to the specification of error in admitting this evidence.

Another related specification of error relates to the following instruction by the court: "You may consider the defendant's failure to report income from the Tarman-Sherwin partnership in 1954, 1955, and 1956, if from the evidence you are satisfied beyond a reasonable doubt that he failed to report such income, on the question of his wilful intent to evade tax and on the question of whether when he made and subscribed his tax returns for those years he believed them correct as to every material matter." This was objected to on behalf of the defendant as follows: "Mr. Foster: And the other objection which I would like to make, Your Honor, to Your Honor's instructions is to your comments upon the Tarman-Sherwin partnership income, which I believe is not a proper factor in the case. I believe Your Honor instructed that the jury could take into account any unreported income from the Tarman-Sherwin partnership * * *."

▮ If the instruction quoted above related solely to the first testimony we have quoted, namely, that elicited from the witness Neilands, we would consider the instruction improper, for the evidence disclosed that generally speaking the returns for 1954, 1955 and 1956, as made out by the accountant Joyce, included Sherwin's share of the Tarman-Sherwin partnership income. These were taken by Joyce himself from the partnership returns. In other words, Sherwin had no part in listing or setting out of this portion of the partnership income as he left that to Joyce who knew about it as Sherwin did not.

▮ But the record is that the Melfort dividends were not accounted for in Sherwin's tax return for 1956 and in that respect Sherwin's share of that partnership dividend would be like any other omit-

---

11. This evidence was to the effect that the Tarman-Sherwin partnership owned 100 shares of stock in the Melfort Meat Company; that in 1956 shares of the David Meat Company were distributed to the stockholders of the Melfort Meat Company. Sherwin's share of this dividend to Tarman-Sherwin, it was testified, amounted to property of the value of $606. The evidence showed that Joyce, the accountant, had no knowledge of this partnership dividend from the Melfort Company and accordingly these dividends had not been included in the partnership return or in Sherwin's individual return as income from the partnership.

ted income of which Sherwin would have cognizance. It was unknown to Joyce. It could be that the language should have been more specific in indicating that this instruction had reference solely to the Melfort Company dividends, and not to any other partnership income, but no request for a more careful distinction in the instructions was made by counsel as required by Fed.R.Crim.P. 30. Hence, since the instruction as applied to the Melfort Company dividends would be proper, we cannot find any reversible error here.

The defense asked the court to require the Government to produce an internal revenue report made by Agent Neilands on the basis of his audit of the Tarman-Sherwin partnership. This request was refused and the refusal is assigned as error.[12] The inquiry is whether this refusal operated unfairly to limit the defendant's opportunity to present his case or to meet that of the Government.

As we have noted, the Government's case in general did not involve any claim of improper failure to report income from the Tarman-Sherwin partnership with the exception of the single item relating to Melfort's distribution of the David Meat Company stock,[13] previously referred to.

█ Appellant argues that if he had this report it would have aided him greatly in showing the amount of losses resulting from the failure or bankruptcy of the Bechtel corporation. But, as we shall develop hereafter, the losses from that source cannot aid the defense. We are unable to perceive how any prejudice developed from the failure of the court to require the furnishing of this report particularly in view of the fact that the defendant's expert witness testified that he had access to the Neilands papers.[14]

Appellant has separately assigned error on account of the giving of two instructions, one relating to a definition of willfulness, and the other advising the jury that one may infer that a person ordinarily intends the natural and probable consequences of his acts. Two somewhat similar instructions were held to be error in a tax fraud case similar to the present one—Bloch v. United States, 9 Cir., 221 F.2d 786, rehearing denied 223 F.2d 297; and see Haner v. United States, 5 Cir., 315 F.2d 792.

12. It is not entirely clear as to just what is the basis of this claim on the part of the appellant. The main contention appears to be that if the defendant had been permitted to have inspection of this report, he might have found something in it which would aid him in his defense. Neilands was called as a defense witness. There was no attempt to call him as an adverse or hostile witness or any suggestion that he should be subjected to cross-examination by the defense. It is not suggested that the so-called "Jencks" Act, 18 U.S.C. § 3500, has any application here. The production required by the Act is restricted to production for impeachment purposes. Palermo v. United States, 360 U.S. 343, 349, 79 S.Ct. 1217, 3 L. Ed.2d 1287.

13. Indeed, in the Government's exhibit constituting a summary of the adjustments to income based upon the testimony for the year 1956, the David Meat Company dividend is not even listed although the dividends from the Melfort Company on account of Sherwin's own individual stock in that company are added to sums charged as income improperly omitted by Sherwin. The $606 is not listed on that exhibit.

14. This witness, Moran, testified that he had made an audit of the affairs of the Tarman-Sherwin partnership on behalf of the defendant. In connection with that he became acquainted with agent Neilands who had, he said, done an excellent job in putting together a lot of information "much of which we used in the job of constructing this double entry set of books of the partnership." He stated that when he first started to reconstruct books of the partnership, Joyce told him about the work of the internal revenue service and suggested that the work papers be procured from them so that "1 was able to borrow a photograph of Mr. Neilands' work papers." These were obtained from an accountant retained by Tarman. The witness testified that when he prepared his ultimate exhibit, he had a copy of Neilands' worksheet and had the Government agent's evaluation on the items.

The first of these instructions, referred to by appellant as the so-called "Murdock instruction" since it is said to resemble language used in United States v. Murdock, 290 U.S. 389, 394, 54 S.Ct. 223, 78 L.Ed. 381, was as follows: "You are instructed that in common, everyday speech 'wilful' denotes an act which is intentional, knowing or voluntary, as distinguished from accidental; but when it is used in a criminal statute, where one of the elements is a specific intent to defraud, it has a somewhat different meaning. It generally means an act done with a bad purpose, without justifiable excuse. The word 'wilful' is also used to characterize a thing done without ground for believing it is lawful."[15]

■ The main difficulty with appellant's argument concerning the so-called Murdock instruction is that the instruction as given in the first paragraph quoted above was requested by the defense. We cannot see how error can be predicated upon the action of the court in accepting and giving an instruction proposed by the appellant himself.

■ We are wholly unable to follow appellant's argument that he really objected to the giving of that instruction. The record does not bear that out. The instruction as given was a part of the instructions proposed by the defendant. It was his proposed instruction No. 19. After the conclusion of the testimony, the court in the presence of counsel for both parties, proceeded to consider the instructions requested by counsel, settle them, and to notify counsel which of their requested instructions the court would give. At the outset the trial judge announced that he would give certain of the defendant's requested instructions. After announcing and reading certain other instructions which the court proposed to give, the court said: "Defendant's instruction No. 19, United States v. Murdock instruction, will be given to the jury as submitted." Thereafter counsel for the defendant made no comment whatever upon this announcement or concerning it after it was given.

Notwithstanding this, counsel for appellant has attempted to argue here that the court must have understood that the defendant was not only withdrawing its requested instruction No. 19, but was objecting thereto. The argument proceeds as follows: at an earlier stage in the settlement of the instructions the court first indicated that it would give an instruction submitted by the Government which had some resemblance to the so-called Murdock instruction; this instruction, as proposed by the Government, is set forth in the margin.[16] At this time counsel for the defendant stated an objection thereto as follows: "Mr. Foster: We have actually the same objection to that instruction as we had to the previous one. I believe that is a paraphrase of the so-called Murdock instruction, which has been disapproved in this Circuit in the case of Bloch v. United States and in the case of Palermo v. United States. * * * The instruction would appear to us, at least, Your Honor, to put the defendant in jeopardy on the basis of negligence rather than on the basis of a specific in-

15. Appellant further asserts that the court at another place in the body of the instruction gave substantially the same instruction when it said: "If a taxpayer honestly believes that he has paid all the taxes he owes, he is not guilty of criminal evasion. But if he acts without reasonable ground for belief that his conduct was lawful, it is for you to decide whether he was acting in good faith or whether he intended to evade the tax."

16. "A man may not shut his eyes to obvious facts and be heard to say that he does not know. He may not close off his observation and knowledge of things that are out in the open and are obvious to him and be heard to say, 'I have no knowledge of these facts.' If a man in good faith believes he has paid all the taxes he owes he cannot be guilty of criminal attempt to evade the tax. But if a man acts without reasonable grounds for belief that his conduct is lawful, it is for the jury to decide whether he was acting in good faith or whether he wilfully intended to evade the tax. This issue of intent is one which you must determine for yourselves from a consideration of all the evidence in the case bearing on state of mind."

tent." The court then announced "Well I think you have established your record here, and in the light of your observations I will specifically review this instruction once again." Thereafter, when the court charged the jury it omitted all of the first two sentences of the proposed instruction, set out in the last footnote, and gave, in substance, what appears in the last three sentences.

Under these circumstances we are unable to perceive how the trial judge could be charged with any fault or error in giving the charge requested in defendant's instruction 19. Counsel for the defendant must have been present when the instructions were read to the jury; they must have recognized the language in their requested instruction No. 19 at that time and must have known that the court added the three sentences last referred to. When the charge was concluded the jury was excused and the court inquired if there were any additional objections or exceptions other than those theretofore stated. Counsel for appellant then made two other objections, neither of which had any reference to the so-called Murdock instruction and one of the counsel for the defendant then concluded by saying: "Might I say on behalf of the defendant that the defendant is otherwise satisfied with the instructions and thanks Your Honor for the instructions and likewise counsel thank you for the comment."[17]

■ What we have just said does not finally dispose of the question of what are the consequences of the giving of this so-called Murdock instruction;—for if it should appear that the giving of that instruction was seriously prejudicial to the defendant, this court would then consider the question of whether it should be noted as plain error under Fed.R.Crim.P. 52(b) regardless of whether objection was made at the trial.

In Herzog v. United States, 9 Cir., 235 F.2d 664, 666, this court quoted from the opinion of Judge McAllister of the Sixth Circuit, his statement that: "Of course, an appellate court will consider an error in the charge which is seriously prejudicial or amounts to a grave miscarriage of justice even though no objection was made in the trial."

Fed.R.Crim.P. 30 provides: "No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."

Whether this requirement should be disregarded in this case and Fed.R.Crim. P. 52(b) applied is a matter to be tested by the standards stated by us in Herzog v. United States, supra, where we said that the point was "whether under the circumstances here present the error, if any, in giving the willfullness instruction was of so serious a nature as to warrant the disregard of Rule 30." 235 F.2d at 667. We think that this can best be answered in connection with our discussion of the other instruction here mentioned, namely, the one referring to "natural and probable consequences" of one's acts.

That instruction was as follows: "It is reasonable to infer that a person ordinarily intends the natural and probable consequences of acts knowingly done or knowingly omitted. So unless the contrary appears from the evidence, the jury may draw the inference that the accused intended all the consequences which one standing in like circumstances and possessing like knowledge should reasonably have expected to result from any act knowingly done or knowingly omitted by the accused."

The somewhat similar instruction given in Bloch v. United States, supra, and there held to be not only error but

17. It should be noted that we do not here pass upon the question whether the so-called Murdock instruction was or was not a correct statement of law. As noted shortly, we consider here merely the question whether the instruction, assuming it was incorrect, was prejudicial in this particular case.

plain error, was as follows: "The presumption is that a person intends the natural consequences of his acts, and the natural inference would be if a person consciously, knowingly and intentionally did not set up his income, and thereby the government was cheated or defrauded of taxes, that he intended to defeat the tax." 221 F.2d at 788.

We assume that a jury would hardly be compelled to find any difference in the use of the word "infer" in one instruction and the word "presumption" in the other. But there are other differences in these instructions. The one here involved is rather general, while the instruction found to be prejudicial in the Bloch case is very specific and by that fact alone was deemed to be dangerously misleading. That instruction referred to a person who consciously, knowingly and intentionally "did not set up his income, and thereby the government was cheated or defrauded of taxes." The instruction was that it was presumed that such a person intended to defeat the tax. That instruction got right down to the flesh and bones of the particular case.[18]

Although the instruction here in question was objected to,[19] the total picture presented by the instructions was quite different from that which appeared in the Bloch case. Here the language relating to the inference that a person ordinarily intends the natural and probable consequences of acts knowingly done or knowingly omitted, came fairly early in the course of a lengthy and extended charge. (The charge occupies 40 pages in the record and the instruction in question appeared on the twelfth page.) It followed an instruction on the question of proving intent by circumstantial evidence; thereafter, following the description of the charges made in the indictment and other instructions on various phases of the case, the court listed the three essential elements which were required to be proved in order to establish the offense charged in each of the first three counts including as the third: "The fact that the defendant in the manner charged in such counts of the indictment willfully attempted to evade or defeat the additional tax, with the specific intent to defraud the Government of such additional tax." [20]

The court instructed the jury that "With respect to crimes such as charged in this case, specific intent must be proved before there can be a conviction." The court correctly defined specific intent stating that it "requires more than a mere general intent to engage in certain conduct"; "A person who knowingly does an act which the law forbids, or knowingly fails to do an act which the law requires, intending with bad purpose, either to disobey or disregard the law, may be found to act with specific intent." The

---

18. It was also noted in the Bloch case that the objectionable language immediately followed a sentence which correctly stated that the attempt charged in the indictment must be willful and intentionally done to defraud the Government. Thus, immediately following the correct statement of the rule as to willfulness and intent it could well be assumed that the language used relating to presumption drained away from the prior statement of the correct rule a good share of its force.

19. The objection was stated as follows: "At the commencement of the instructions Your Honor gave the standard instruction concerning the natural and probable consequences of a defendant's act, and it is my belief that that instruction is inapplicable in a case of this character."

20. These three elements were stated as follows:
"First: The fact that a substantial amount of federal income tax was in fact due and owing from the defendant for the calendar years in question, namely, 1954, 1955 and 1956, in addition to the tax declared or disclosed in the defendant's income tax returns for said calendar years;

"Second: Knowledge of the defendant that some additional income tax of a substantial amount was due and owing from him to the Government for such calendar years; and

"Third: The fact that the defendant in the manner charged in such counts of the indictment wilfully attempted to evade or defeat the additional tax, with the specific intent to defraud the Government of such additional tax."

instructions proceeded to advise the jury again and again as to the requirement that the Government prove beyond a reasonable doubt the willfullness and the specific intent to evade or defeat the tax.[21]

Following this series of correct instructions as to willfullness and specific intent, the court then instructed the jury at length with respect to some other matters and then gave the instruction previously quoted and referred to in footnote 15, supra. Thereafter the court *again* returned to the questions of willfulness and intent and repeatedly called the attention of the jury to the require-

ment of proof of specific intent to attempt to evade and defeat taxes.[22]

Our consideration of the instructions taken as a whole compels us to say that in view of this massive repetition of instructions with respect to the requirement of proof of willfullness, and of specific intent to attempt to evade and defeat the tax, we must adopt the reasoning applied by this court in Legatos v. United States, 9 Cir., 222 F.2d 678, 687–688,. where the court in dealing with similar instructions said that when considered as a whole the court's instructions on intent. and willfullness "correctly stated the law and were not such as to mislead the jury."[23]

21. Thus the jury was advised that the word "attempt" as used in the statute involves two things: "One, an intent to evade or defeat the tax and two, some act done in furtherance of such intent", that the accused had knowledge and understanding during these years he had an income which was taxable and which he was required to report and that he nevertheless attempted to evade or defeat the tax "by purposely failing to report all the income which he knew it was his duty to state in his returns." The jury was told that the statute makes it an offense willfully to attempt to evade in any manner any income tax imposed by law; that the attempt to evade or defeat the tax must be "a willful attempt that is to say, it must be an attempt knowingly made with the specific intent to keep from the Government a tax imposed by the income tax laws." Again the jury was told "In other words, the attempt must be knowingly made with the bad purpose of seeking to defraud the Government of some substantial amount of income tax lawfully due from the defendant;" that "A mere failure of a taxpayer to report a portion of his taxable income is not a crime within the meaning of this section unless it has been proved beyond a reasonable doubt that he willfully attempted to evade or defeat his income taxes;" that they might convict if satisfied beyond a reasonable doubt that a substantial tax was due "and that the defendant knew or believed the same to be due and that with such knowledge and belief he filed a false and fraudulent income tax return for any such year in a willful attempt to evade and defeat a large part of the tax due for such year and with the in-

tent to defraud the Government of such additional tax."

22. The jury were told that the section applicable to the first three counts "punishes: a wilful attempt to evade and defeat taxes in any manner." The court then indicated the manner in which intent and willfulness might be proven by circumstantial evidence. The jury were told that if the defendant honestly attempted to provide the accountant with all the information reasonably necessary to help him prepare correct income tax returns, and that the taxpayer, when he signed the returns, presumed and believed that the returns as made were true and correct, "then your verdict should be not guilty as. to Counts One, Two and Three, for there would be absent the element of knowing and wilful intent to evade or attempt to. evade the payment of income taxes."

The jury were told that if they found from the evidence that the defendant in. doing the acts shown by the evidence "acted without corrupt intent, that is to say, the intent to evade or defeat a large part of the income tax due and owing by him and his wife for the years in question, such lack of corrupt intent will entitle. the defendant to an acquittal at your hands as to any such counts on which you so find." They were told that the word "willful" as used in the statute "means. deliberately and with knowledge, as distinguished from something which is merely careless, inadvertent or negligent."

23. In Forster v. United States, 9 Cir., 237 F.2d 617, 619, an instruction similar to. the one here in question had been given. The judgment was reversed not because of the giving of that instruction but be--

Where, as here, the trial court over and over again correctly charged the jury as to the necessity of proving willfullness and specific intent, and that such must be proven beyond a reasonable doubt, and correctly defined willfullness and specific intent, we cannot do otherwise than hold not only that the instruction with respect to the inference that a person intends the natural and probable consequences of his acts but also that the so-called Murdock-type instruction could not have been prejudicial or have misled the jury.

The court properly instructed the jury that as to the first three counts of the indictment the Government must establish beyond a reasonable doubt that there was a substantial amount of federal income tax due and owing from the defendant for the particular years covered by these accounts. Holt v. United States, supra, 272 F.2d at 278, 279.

It is argued that with respect to the first three counts the court should have held that no tax was due and owing as a matter of law. In order to understand the point here made it is necessary to allude to a somewhat related contention made by the defense during the trial, in fact one of the principal defenses then urged, which the court submitted to the jury by instructions that are not questioned on this appeal.

The defendant asserted that he did not actually owe any tax at all for the years 1954, 1955 and 1956, because he had suffered a net operating loss in the year 1951 in an amount such that he was able after carry-back to carry that loss forward through the years 1954, 1955 and 1956; that as a result he would owe nothing for those years.

It appears that initially Bechtel had owned 50% of the stock of the Bechtel corporation, previously mentioned, Tarman had 25% and Sherwin had 25%. At the end of the year 1950, Sherwin and Tarman completed a contract whereby Sherwin acquired all of Tarman's stock in that corporation. The same parties, that is to say, Bechtel, Tarman and Sherwin, also organized some 22 other corporations which were associated with the Bechtel corporation and used by its owners in the enterprise of developing subdivisions. As Sherwin put it, the 23 corporations, including the Bechtel corporation, were all associated in the same general enterprise. Initially Sherwin had a one-fourth interest in each of them although it does not appear that any of them other than the Bechtel corporation actually issued stock. One of the corporations was the T. R. Bechtel Lumber Company which provided lumber for the operations. Apparently the other corporations were utilized to handle subdivisions being promoted, and title was placed in their names to protect the initial company in case the individual enterprises ran into difficulty or failed. The Tarman interest in all these enterprises passed to Sherwin when Sherwin acquired Tarman's interest in the Bechtel corporation stock.

In 1951 the Bechtel corporation and the others failed and went into bankruptcy. The defense was that Sherwin did not owe any taxes in the years 1954, 1955 and 1956 because the operating losses sustained by him through the failure of the Bechtel interests in 1951 were so great that he was permitted to carry forward a portion of that loss sufficient to wipe out any tax for the three years here referred to. The Government disputed

---

cause after the jury had deliberated for some time, the court, at the request of the jury, had then supplemented its earlier instructions by the giving of a Murdock-type instruction.

It was held that this instruction called for reversal because it was given at "too critical a time", hence, it came in "too bright a light"; "it did not run in a long chorus line". Implicit in the special rea-

sons given for that decision is the suggestion that the giving of the instruction as to one's intending the natural and probable consequences of acts knowingly done was not prejudicial for the reasons stated in the Legatos case. See also in accord with Legatos, Elwert v. United States, 9 Cir., 231 F.2d 928, 937; Bateman v. United States, 9 Cir., 212 F.2d 61, 69–70.

this claim asserting that it was a capital loss, not an ordinary loss or an operating loss.[24]

Prior to the time of trial, Sherwin made no claim other than that his loss of stock in the Bechtel corporations was a capital loss. In his 1951 tax return he listed this as a capital loss and listed as his net loss for 1951 on this account the sum of $1000 which would be in accord with § 117(d) (2) quoted in the last footnote.

At the trial the defendant claimed that he was engaged in the business of promoting corporations and that this was a business separate and apart from his profession and also separate and apart from his activities as a stockholder or officer in these corporations. The court submitted this question to the jury, and defendant found no fault with the lengthy and detailed instruction upon this question.

The jury were told that if these losses arising from the bankruptcy of the Bechtel corporation were in fact net operating losses from a business of the defendant, and if they were greater than his taxable income for 1951, such losses could be carried back to the year 1950 and losses still remaining could be carried forward through each of the years referred to in Counts 1, 2 and 3. With respect to what these losses on the worthless stock amounted to the testimony varied from $58,000 to $157,000, these computations being calculated from the cost basis in defendant's hands of Bechtel corporation stocks.[25]

We are not here presented with any question as to the propriety of the instruction, and of course the verdict of the jury disposes of the question whether, as concerns his holdings of stock in the Bechtel corporations, Sherwin was engaged in a separate trade or business involving promoting corporations.[26]

24. The applicable provisions of I.R.C.1939 are as follows: § 23(g) (2) providing that if securities become worthless during the taxable year and are capital assets, the resulting loss shall "be considered as a loss from the sale or exchange, on the last day of such taxable year, of capital assets"; § 122(a) and (d) (4). Subdivision (a) defines "Net Operating Loss" and refers to exceptions and limitations provided in subsection (d); subsection (d) (4) provides "The amount deductible on account of losses from sales or exchanges of capital assets shall not exceed the amount includible on account of gains from such sales or exchanges"; § 117(a) (1) provides that "capital assets" means "property held by the taxpayer (whether or not connected with his trade or business)", and then lists items not included, among them the following: "(A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business"; § 117(d) (2) provides that "In the case of a taxpayer, other than a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of the gains from such sales or

exchanges, plus the net income of the taxpayer, or $1000, whichever is smaller."

25. The fact question thus submitted to the jury by the court's instruction was one which was similar to the question involved in Whipple v. Commissioner, 373 U.S. 193, 83 S.Ct. 1168, 10 L.Ed.2d 288.

26. There is no claim that when Sherwin made the tax returns here in question he *thought* he was entitled to deduct losses arising out of the Bechtel corporations' failure. We have noted that in his 1951 tax return he claimed only the statutory $1000 as a capital loss. That return stated that his occupation was "Corporation promotion & Attorney," but he evidently did not have any such occupation, or any consequences thereof in mind in 1954, 1955 or 1956, or when his returns for those years were filed, for he testified at the trial that as he then looked at his 1951 return, this was "the first I had noticed it says 'Corporation promotion and attorney'. That's Mr. Joyce's language. * * * I had never noticed that notation before. As a matter of fact, until this year I wasn't aware that there was any significance." Revenue Agent Grappo testified that when he interviewed Sherwin about his tax returns for 1954, 1955 and 1956, which the agent was then auditing, "He never told me anything that he had any deductible losses which

It thus appears definitely that Sherwin's holdings of stock or other interests in these corporations could not be called stock in trade within the meaning of § 117(a) (1) A, referred to in the above footnote, 24.

Notwithstanding the failure of the defense to question the propriety of the submission of the question just referred to to the jury, the appellant now argues, apparently for the first time on this appeal, that other facts and circumstances which were developed relating to Sherwin's dealings with the Bechtel corporation resulted in a finding and determination by the Government which operated, somewhat in the manner of res judicata or collateral estoppel to require the Government to treat Sherwin as having been in the business of promoting corporations as a matter of law.

The circumstances referred to have to do with the action of the Internal Revenue Service upon a claim for refund which Sherwin filed on some date, not specifically shown, between 1952 and 1954.[27] The claim was for a refund of taxes for the year 1950, and the claim stated that refund was "the result of an operating loss to be carried back from the calendar year 1951 to the calendar year 1950—see Form 1045 attached." The attached form asserted a net operating loss for 1951 of $21,001.73. This figure is taken from Sherwin's tax return which claimed a net operating loss for the year in the amount stated—$21,001.73.[28]

On April 13, 1954, the district director of internal revenue wrote to Sherwin and his wife stating that to complete the audit of their income tax return for the year 1950–51, they were requested "to substantiate with evidence your statement that you are 'in the business of promoting corporations'. Please give full details concerning claimed capital loss of $30,000 and loan to Bechtel Co. in the amount of $21,115." Sherwin replied to this under date of May 4, 1954, listing the corporations in which he had participated as a principal in organizing them. He gave the names of some 27 corporations. In explanation of the so-called "capital loss of $30,000" he recited that in 1951 he owned 50% of the stock of the Bechtel Company and Bechtel Lumber Co.; and that the $30,000 mentioned was an arbitrary figure used "in lieu of a larger and more accurate figure because the deduction allowable to him would not be increased by fixing an accurate figure." [29]

He further explains his loan of $21,115 to Bechtel Lumber Co. reciting that it became bankrupt in 1951. None of the correspondence just mentioned made any reference to the claim of refund for 1950. Subsequently Sherwin received from the office of the district director a notice of adjustment of his claim for a refund of 1950 taxes which recited: "An examination of the records of this office pertaining to your tax return, Form 1040, filed for the taxable year 1950 indicates an assessment or payment in excess of the

he wished to claim in any of the years that I had, for example, 1954, 1955, or 1956, or that he had any deductible losses for any year." What is here said is relevant to the question of intent and willfulness previously discussed. We mention it notwithstanding no argument has been made that Sherwin thought he could claim these losses. Indeed, had Sherwin *thought* he had these deductible losses, there would have been no point in his filing the returns that he did, showing some tax due.

27. The uncertainty as to date is due to the fact that the claim was proven by introduction of a written copy, not the original, which copy bears no date.

28. This was arrived at as shown on the return as follows: "Net income from law practice—$113.27; loss resulting from cash loan to Bechtel Lumber Company in 1951—[Bechtel Lumber Company went into bankruptcy in October, 1951] No possibility of recovery—$21,115." The amount of net operating loss was arrived at by deducting the income from the law practice from the loss resulting from the cash loan.

29. Again we note that in his 1951 return Sherwin entered under the heading of capital losses the statutory sum of $1000.

amount due." It showed an overpayment of $2102.40 plus interest of $358.44,[30] making a total refund of $2460.84 which Sherwin received about October 3, 1955.

Appellant contends that in making refund on the basis of this claim the administrative officers of the Bureau of Internal Revenue made a decision which was based upon their conclusion and finding that Sherwin was a dealer in corporations as he had claimed. Appellant says that this was a finding of fact of the Secretary upon the merits of that claim; —a finding that Sherwin was a dealer in corporations and entitled to ordinary operating loss treatment.

Appellant cites I.R.C.1954 § 6406 which recites that in the absence of fraud and mistake in mathematical calculation a finding of fact and the decision of the Secretary or his delegate upon the merits of any claim shall not, except as provided in the chapters relating to the Tax Court, be subject to review by any other administrative or accounting officer, employee or agent of the United States. It is asserted that not even the trial court can now make a determination that Sherwin was not a dealer in corporations.

▆▆▆ We think that this contention is not well founded and that the court and jury were at full liberty to find, as they did, that in respect to Sherwin's loss of the corporate stock, referred to, in 1951, he was not entitled to be treated as a person engaged in the business of promoting corporations.

The proof on the part of the Government was that the claim was allowed as a tentative allowance of what was called under the Department's practice, a "quickie" claim. This was a system adopted to give quick economic relief to a taxpayer claiming a refund without any final determination of its correctness. But the significant fact is that there was

no final agreement made between the Bureau and Sherwin as to the correctness or incorrectness of the claim.

The significant, and as we view it, controlling statutory provision is I.R.C.1954 § 7121 which provides as follows: "Closing agreements (a) Authorization.—The Secretary or his delegate is authorized to enter into an agreement in writing with any person relating to the liability of such person * * * in respect of any internal revenue tax for any taxable period. (b) Finality.—If such agreement is approved by the Secretary or his delegate * * * such agreement shall be final and conclusive, and, except upon a showing of fraud or malfeasance, or misrepresentation of a material fact—

"(1) the case shall not be reopened as to the matters agreed upon or the agreement modified by any officer, employee, or agent of the United States, and

"(2) in any suit, action, or proceeding, such agreement, or any determination, assessment, collection, payment, abatement, refund, or credit made in accordance therewith, shall not be annulled, modified, set aside, or disregarded."

(The provision is similar to I.R.C.1939 § 3760). Here there was no closing agreement and the effect is that stated in McIlhenney v. Commissioner, 3 Cir., 39 F.2d 356, 358, where the court was dealing with the statutory provision of an earlier Act not distinguishable from I.R.C.1954 § 7121. The court there said: "In the case at bar, the statutory procedure was not followed, in that there was no agreement in writing, or otherwise, that the determination and assessment of February, 1924, should be final and conclusive. As a consequence, we are constrained to hold that the determination and assessment of 1924 were not final and conclusive, and that the Commissioner was not estopped or otherwise barred, by the pay-

30. This interest which was received with the refund in the year 1955 was listed by the Government as one of the items of income omitted from Sherwin's 1955 tax return. The notice of adjustment carried the following notation adjoining the statement of the interest: "The full amount of interest received and the interest if any allowed on the credit or refund of federal taxes is taxable income and should be included in your income tax return as income for the taxable year in which received or applied as a credit for other taxes."

ment and acceptance of the tax based on such determination and assessment, from reopening the case and making the further determination subsequently made by him." That case was expressly approved and its rule adopted in Burnet v. Porter, 283 U.S. 230, 231, 51 S.Ct. 416, 75 L.Ed. 996.[31]

What this means is that notwithstanding the action taken upon the claim arising out of the loan, the Commissioner had the right, as the cases just cited show, to change his ruling even on the claim as made, and any time thereafter. A fortiori the Commissioner and the Secretary had the right, and under the facts found, it was their duty, to treat Sherwin's loss of corporate stock exactly as he himself sought to have it treated in his 1951 return, namely, as a capital loss subject to the $1000 limitation.

Appellant says that if the refund under the claim relating to the loan was erroneous, the Government could not recover that by suit after two years following the making of the refund, citing I.R.C.1954 § 6532(b). Evidently no such suit for refund was brought; but that circumstance can have no bearing whatever upon the authority of the Commissioner to treat the loss of the Bechtel stock as a capital loss and not otherwise. Only a closing agreement could operate to estop the Commissioner from ruling that the stock loss was not an ordinary operating loss to Sherwin.

Appellant finds fault with the court's refusal to give his offered instruction to the effect that a taxpayer may deduct losses incurred in a trade or business carried on by a corporation where that corporation is a simple dummy created solely as a protection against creditors without any function other than as a receptacle for title; and that in such case the loss is the loss of the taxpayer not that of the corporation. The argument is that the jury should have been permitted to hold that the corporate fiction of the Bechtel corporations could be disregarded as mere dummies and that hence the Bechtel corporations' losses were operating losses of the defendant.

The difficulty with this argument is that there is no basis in the evidence for any such holding. Defendant was never the sole stockholder of the corporations. He testified that the Bechtel corporation was engaged in building houses in subdivisions; thus it functioned as a corporation and carried on the business for which it was organized. It was not a mere nominee, nor was it created solely to hold title to land. The same is true of Bechtel Lumber Company which operated a lumber mill to supply lumber for the enterprises. The other affiliated corporations were formed in part to obtain lower tax rates and to avoid financial difficulties in financing contracts for tracts of houses in case other tracts ran into difficulties.

The rules to be applied in determining whether a corporation should be recognized or should be disregarded for federal income tax purposes are set forth fully in Commissioner v. State-Adams Corporation, 2d Cir., 283 F.2d 395, where the court cites and quotes from Moline Properties v. Commissioner, 319 U.S. 436, 439, 63 S.Ct. 1132, 87 L.Ed. 1499, and Higgins v. Smith, 308 U.S. 473, 477, 60 S.Ct. 355, 84 L.Ed. 406. The court distinguished the case of Paymer v. Commissioner, 2d Cir., 150 F.2d 334, a case relied upon by the appellant. As there indicated, a corporation will be treated as a separate taxable entity so long as the purpose of incorporation is the equivalent of business activity, or is followed by the carrying on of the business of the corporation.[32]

31. See in accord Tonningsen v. Commissioner, 9 Cir., 61 F.2d 199, 200. That the statutory closing agreement referred to is the exclusive means of finally closing a tax year see United States v. Hardy, 4 Cir., 299 F.2d 600, Auerback Shoe Co. v. Commissioner, 6 Cir., 216 F.2d 693.

32. Another case relied upon by appellant is North Jersey Title Ins. Co. v. Commissioner, 3 Cir., 84 F.2d 898. This case relied upon Southern Pacific Co. v. Lowe, 247 U.S. 330, 38 S.Ct. 540, 62 L.Ed. 1142. But the latter case was questioned in Burnet v. Commonwealth Imp. Co.,

Appellant also complains of the rejection of its proposed instruction No. 36 to the effect that where real property rented by a taxpayer for the production of income is transferred at a loss it must be deducted from the taxpayer's income in determining whether or not a tax is due and such loss is a net operating loss which may be carried forward. The basis for this contention is that appellant had suffered loss with respect to "Plaza Building" in Sacramento, a property which at one time belonged to the Tarman-Sherwin partnership.

■ Here again we think that the evidence is insufficient to show any such loss. The evidence shows that litigation between Tarman and Sherwin with respect to their several rights in the properties of the partnership was still pending in the state court at Santa Rosa but no judgment had been entered in that case. Sherwin testified that at the time of the trial that property remained in a "status quo". The upshot of this is that if Sherwin ultimately should lose that property or his interest therein, a loss might then occur, but if he should win he would be liable for additional unreported partnership income for the years here in question arising out of the profits of the "Plaza Building". We find no error in the rejection of this proposed instruction.

Appellant specifies a number of alleged errors relating to Counts 4, 5 and 6 of the indictment. It will be recalled that these counts were laid under I.R.C.1954 § 7206(1), and in these, the basis of the offenses described, relating to the same three years above mentioned, is the willful subscription by the taxpayer of a return made and signed subject to penalties for perjury, when the person signing the return knows the same not to be true and correct as to every material matter.[33]

As previously noted the jury returned the verdict of guilty upon all six counts. The defendant was sentenced to imprisonment for a period of one year on each of such counts, the sentences of imprisonment on Counts 2 to 6 inclusive to run concurrently with the sentence imposed on Count 1 of the indictment. He was also sentenced to pay a fine of $1000 and the costs of prosecution on account of Count 1 of the indictment, but on that count only.

What we have said heretofore discloses that we find no error in respect to the judgment relating to the first three counts of the indictment. Recently in the case of Russell v. United States, 9 Cir., 288 F.2d 520, 521, this court applied the long established rule that where "the sentence does not exceed the maximum authorized as punishment for the offense charged in the first count, we need not consider any other count."[34] In support of that rule this court there cited some 13 cases, five from the Supreme Court and eight from this court.

■ Here, as in the Russell case, there is no evidence that the accused received a larger sentence than otherwise would have been imposed because of the verdict of guilty on the additional counts. We therefore find it unnecessary to examine or discuss the specifications of error relating to Counts 4, 5 and 6.

Accordingly, since the judgment imposed on account of Counts 1, 2 and 3 must be approved, the judgment is affirmed.

287 U.S. 415, 53 S.Ct. 198, 77 L.Ed. 399, and finally undermined in National Carbide Corp. v. Comm'r, 336 U.S. 422, 429, 69 S.Ct. 726, 93 L.Ed. 779.

33. The specification of error relating to these three counts refers to the failure of the court to dismiss them; the failure of the court to require the Government to elect between them and the first three counts; the failure of the court to require the Government to state in what manner the failure to state those gains were material; the error of the court in stating that no tax need be due and owing to convict under those three last counts; the failure to give certain other requested instructions bearing upon Counts 4, 5 and 6; and the complaint that the court should have instructed that a tax evasion intent was necessary under those counts.

34. The quoted language is from Sinclair v. United States, 279 U.S. 263, 299, 49 S. Ct. 268, 73 L.Ed. 692.