**UNITED STATES of America,
Appellee,**

**v.**

**Joe Louis MILLER, Appellant.**

**No. 9443.**

United States Court of Appeals
Fourth Circuit.

Argued Sept. 24, 1964.

Decided Jan. 4, 1965.

Arnold M. Weiner, Baltimore, Md. (Joseph S. Kaufman, Baltimore, Md., and Joseph Sitnick, Washington, D. C., on brief), for appellant.

Joseph H. H. Kaplan, Asst. U. S. Atty. (Thomas J. Kenney, U. S. Atty., on brief), for appellee.

Before BOREMAN and BELL, Circuit Judges, and BUTZNER, District Judge.

BUTZNER, District Judge.

Joe Louis Miller, who was convicted of bribery, assigns error because the trial judge overruled his motion for severance and refused special charges to the jury which he tendered. We find no error and affirm the conviction.

Miller was a candy distributor who did extensive business with army commissaries. Clifford V. Lawrence was an army commissary inspector when he became acquainted with Miller. Later he was an employee and manager of the commissary at Fort George G. Meade, Maryland. Miller for several years regularly paid Lawrence large sums of money in cash, and he enjoyed a favored position in the sale of candy at the commissary where Lawrence was employed. The Government contended that Miller bribed Lawrence to prosper Miller's candy business.

Miller was charged in the odd numbered counts of a twenty-count indictment with paying Lawrence money on ten separate occasions, in violation of 18 U.S.C. § 201.[1] The pertinent language of this section read as follows: "Whoever promises, offers, or gives any money * * * to any officer or employee or person acting for or on behalf of the United States, or any department or agency thereof, in any official function, * * * with intent to influence his decision or action on any question, matter, cause, or proceeding which may at any time be pending, or * * * be brought before him in his official capacity, * * * or with intent to influence him to commit * * * any fraud * * * on the United States, or to induce him to do or omit to do any act in violation of his lawful duty, shall be fined * * *."

Lawrence was charged in the even numbered counts of the same indictment with receiving money from Miller on the same ten occasions, in violation of 18 U.S.C. § 202. This section provides for the punishment of a United States official who solicits or accepts a bribe.

The defendants were tried jointly before a jury. Both were convicted. Miller moved for severance before trial and at appropriate times during the trial. His principal reason for urging that he should have been granted a separate trial is that Lawrence and he made conflicting statements to investigating officers which were introduced in evidence. Miller gave statements both to a criminal investigator of the United States Army and to an agent of the Federal Bureau of Investigation. Miller's two statements are substantially similar. Lawrence gave a statement to agents of the Federal Bureau of Investigation. Miller's statement to the criminal investigator and Lawrence's statement, with immaterial deletions, are appended to this decision.

1. Title 18 U.S.C. §§ 201 and 202 were amended October 23, 1962. The indictment was based on the statute before it was amended.

██ ██ The determination of whether a severance should be granted or refused is vested under Rule 14 of the Federal Rules of Criminal Procedure in the sound discretion of the trial judge. Opper v. United States, 348 U.S. 84, 95, 75 S.Ct. 158, 99 L.Ed. 101 (1954). His decision will be reversed only when a clear abuse of discretion is shown. Cataneo v. United States, 167 F.2d 820, 823 (4th Cir. 1948). In a joint trial when a declaration of one defendant is offered in evidence and is inadmissible against another defendant, the trial judge must, by appropriate instructions, restrict consideration of the statement to the declarant's case only. Delli Paoli v. United States, 352 U.S. 232, 243, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957); Ward v. United States, 288 F.2d 820, 823 (4th Cir. 1960), cert. denied Pryor v. United States, 365 U.S. 816, 81 S.Ct. 697, 5 L.Ed.2d 695 (1961). The District Judge carefully instructed the jury that the statement made by Lawrence could be considered only with respect to the case against Lawrence and that it was not evidence against Miller.

██ We are not unmindful that a number of cases hold that it may be error to refuse a severance when a co-defendant's statement implicates the defendant.[2] Illustrative of this principle are Schaffer v. United States, 221 F.2d 17 (5th Cir. 1955), and Barton v. United States, 263 F.2d 894 (5th Cir. 1959). The principles expressed in those cases are, however, not applicable here. Lawrence's statement, while it conflicts in some respects with Miller's statement, did not portray Miller as a briber. Lawrence consistently maintained that what he and Miller did was lawful. Lawrence's statement contained information which, in material respects, was cumulative of that contained in Miller's. Under these circumstances a severance is not required. cf. Carter v. United States, 304 F.2d 881 (5th Cir. 1962).

██ Miller's extrajudicial statement required corroboration. Opper v. United States, 348 U.S. 84, 75 S.Ct. 158 (1954); Smith v. United States, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192 (1954); United States v. Waller, 326 F.2d 314, 315 (4th Cir. 1963). Lawrence's statement could not be used to corroborate Miller's statement. Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Ample corroboration existed, however, without reference to Lawrence's statement. The Government introduced substantial evidence independent of both statements, to establish the trustworthiness of Miller's admissions. Miller suggests, however, that the jurors could not be expected to have disregarded Lawrence's statement in determining whether Miller's statement was corroborated. There is nothing in the record to support this suggestion.

Opper v. United States, 348 U.S. 84, 75 S.Ct. 158 (1954) dealt with assignments of error concerning corroboration and severance. There the defendant was charged with inducing a federal employee to accept outside compensation for services in regard to purchase requests in which the United States had a direct interest. The defendant and the employee were jointly tried after the defendant's motion for severance was denied. The observation of Mr. Justice Reed is pertinent:[3]

"It was within the sound discretion of the trial judge as to whether the defendants should be tried together or severally and there is nothing in the record to indicate an abuse of such discretion when petitioner's motion for severance was overruled. The trial judge here

2. This court recently held that it was error to admit into evidence in a conspiracy trial a confession, (which implicated the defendants standing trial) of a co-conspirator who had pled guilty. United States v. Boyce, 4th Cir. Nov. 6, 1964, 340 F.2d 418.

3. Opper v. United States, 348 U.S. 84, 95, 75 S.Ct. 158 (1954). We decline to accept the defendant's argument that Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) overruled Opper by implication.

made clear and repeated admonitions to the jury at appropriate times that Hollifield's incriminatory statements were not to be considered in establishing the guilt of the petitioner. To say that the jury might have been confused amounts to nothing more than an unfounded speculation that the jurors disregarded clear instructions of the court in arriving at their verdict. Our theory of trial relies upon the ability of a jury to follow instructions. There is nothing in this record to call for reversal because of any confusion or injustice arising from the joint trial. The record contains substantial competent evidence upon which the jury could find petitioner guilty."

Miller requested the District Judge to charge the jury in substance as follows:

"Instruction No. 2: Even if you find that Miller gave monies to Lawrence, you must find Miller not guilty if you find that the money was not given with a corrupt or fraudulent intent.

"Instruction No. 3: If you find that Miller gave monies to Lawrence only through fear of being treated by Lawrence with partiality, and not with any other intent on Miller's part, then you must find Miller not guilty.

"Instruction No. 4: If you find that Lawrence obtained monies from Miller by means of threats, expressed or implied, that Miller would not be permitted to sell his products to the commissary unless he paid the monies to Lawrence, and if you further find [he had] no intent to defraud the Government, then you must find Miller not guilty." [4]

Running through these proposed instructions is the theme that Miller could not be convicted unless the payment of money to Lawrence was accompanied by a corrupt or fraudulent intent. In-

struction number 2 expressly states this proposition. Instructions 3 and 4 state the same theory in a negative manner by emphasizing that fear of loss of business unaccompanied by intent to defraud is a defense.

The District Judge refused the proferred instructions. He charged the jury on the issue of intent:

"* * * you must be convinced beyond a reasonable doubt that money or remuneration was offered and paid by Miller to Lawrence with intent to influence Lawrence in his decision or action on any matter before him in his official capacity or to induce him to do or omit any act in violation of his duty.

"Thus, either an intention to influence official behavior or intention to induce unlawful action will result in a violation of this statute.

"I instruct you that it is not necessary that the United States be, in fact, defrauded for this section to be considered violated. There need only be the requisite intent to influence decisions or to induce unlawful actions by payment of money to a Government official, or employee or person acting for the Government."

The District Judge committed no error in refusing the tendered charge. Title 18 U.S.C. § 201 explicitly states in alternatives the intent necessary to constitute bribery. Either an intention to influence official behavior or an intention to induce a breach of duty makes the briber culpable. United States v. Labovitz, 251 F.2d 393, 394 (3rd Cir. 1958). It is immaterial whether the official action which the briber seeks to influence is right or wrong, in the sense that it is expected to result in pecuniary injury to the Government or that it calls upon the bribe recipient to do something other that what he is legally obligated to do. Daniels v. United States, 17 F.2d 339, 343 (9th Cir. 1927), cert. denied, 274

---

4. The defendant's objection to the court's failure to grant his proposed instruction number 1 was not briefed by the par-
ties in this court. In any event, the instruction was not justified by the evidence.

U.S. 744, 47 S.Ct. 591, 71 L.Ed. 1325 (1927); cf. Wilson v. United States, 230 F.2d 521 (4th Cir. 1956), cert. denied, 351 U.S. 931, 76 S.Ct. 789, 100 L.Ed. 1460 (1956). Given the clear definition by Congress of the intent requisite for a violation of the statute here involved, we decline to engraft upon it the additional requirement that the briber act with a corrupt or fraudulent state of mind.

Miller insists that the requested instructions were necessary to present to the jury a defense of extortion, an issue upon which the district judge refused to charge. The Government suggests that extortion cannot be a defense to a violation of 18 U.S.C.A. § 201.[5] This case, however, does not require that we decide the broad proposition urged upon us by the Government, for we do not think the evidence will support a claim of extortion. Although Miller in his statement did indicate that the reason he paid money to Lawrence was that he "figured that I had to give him something or I would lose my business at Fort Meade", and although the threat of economic harm may under some circumstances result in extortion, Hornstein v. Paramount Pictures, 292 N.Y. 468, 55 N.E.2d 740 (1944), there was no proof introduced in this case to show that Lawrence had threatened Miller with economic harm unless the periodic payments continued. In any event, Miller by his payments was purchasing influence with and favored treatment from Lawrence. Fear of losing his illegal advantage if the payments were discontinued was not extortion.

Affirmed.

## APPENDIX A

Statement Made by Joe Louis Miller to United States Army Investigator

"I am the proprietor of the Jay Bee Distributing Company and I have owned this company about eight years. About five or six years ago, I was residing at 8202 New Hampshire Avenue, Silver Springs, Maryland. At this time Mr. Clifford Lawrence was a neighbor. Occasionally I would bring my truck home and one day Lawrence mentioned to me that I should try to sell the commissary at Fort Meade. At this time, I did not know what kind of work that Cliff Lawrence was doing or that he was working at Fort Meade. When Lawrence mentioned this to me, I found that he was working at Fort Meade.

"The next day at about 10:00 o'clock, I came to Fort Meade and spoke with the Commissary Officer, * * *. I showed him my line, which consisted of Brach candy. The Commissary Officer told me to start servicing the commissary. Since that time I have served the commissary at Fort Meade.

"A couple of weeks after I received permission to service the commissary, Cliff Lawrence approached me and asked to borrow two hundred dollars. I loaned him the money and he never attempted to pay it back and did not say anything to me about the money. Although I can (not) remember for sure, but it seems that about three to six months after Cliff borrowed the first two hundred dollars, he came to me and asked to borrow two hundred dollars more. I gave him the money again.

"I could see that payment to Cliff would be a steady thing, as he was apparently going to keep coming to me for money. This is what went through my mind in any event.

"A little later, Cliff and I started talking about the money and as I felt he would continue to come to me for money. I agreed with him to pay him one hundred dollars a month and one thousand dollars at the end of each year. I felt that this was better than to pay him a percentage and I would not have to worry about the bookkeeping.

---

5. The Government relies upon United States v. Kabot, 295 F.2d 848, 854 (2nd Cir. 1961) (dictum), cert. denied 369 U.S. 803, 82 S.Ct. 641, 7 L.Ed.2d 550 (1962). But cf. Daniels v. United States, 17 F.2d 339, 343 (9th Cir. 1927) (dictum), cert. denied 274 U.S. 744, 47 S.Ct. 591, 71 L. Ed. 1325 (1927).

"I told this to Cliff in so many words. He was in agreement with this arrangement. I certainly would not have given this money freely, but by Lawrence's actions I figured that I had to give him something or I would lose my business at Fort Meade.

"Since that time I have not increased my payments to Lawrence and he has not requested any increase. I would not have paid any money to Lawrence if I did not need the Government's business at Fort Meade. It is indeed a pleasure that I will not have to pay any money like this again. I can honestly state that should any Commissary Officer approach me for money in the future that I will not give him any and I will report him to the proper authorities.

"I would also like to state that this is the only time that I have paid out any money to anyone, and I repeat, that I will not do this again.

"I realize that Cliff Lawrence was wrong in what he was doing, but at the time I needed the business in a bad way. I was just getting started and this was like a shot in the arm. The Fort Meade Commissary is or was my first commissary.

"At the present time, I definitely would not engage in the type of proposition that I did with Cliff Lawrence.

"I do want to say that by paying Cliff Lawrence $2,200.00 a year had nothing to do with the prices of my product. The prices have remained the same as they were before I started to selling to the commissary. Also, I sell to other commissaries at the same price as I sell to Fort Meade.

\* \* \* \* \* \*

"Question, how did you pay Cliff Lawrence?

"Answer, I always pay him in cash and each month. On the $1,000.00 I would pay it in split payments, usually in May, June or July.

"Question, when did you make the last payment to Cliff Lawrence?

"Answer, last month. I think it was at his home.

"Question, did you realize any favors at the Fort Meade Commissary, because of your relations with Lawrence?

"Answer, I did not think so."

## APPENDIX B
### Statement made by Clifford V. Lawrence to an Agent of the Federal Bureau of Investigation

"About five years ago, \* \* \* (the) Commissary Officer at Fort George C. Meade, Maryland, came to me and asked me if I knew any candy dealers who could furnish candy to the Fort Meade Commissary of an acceptable brand. At that time, I was living at 8204 New Hampshire, Silver Spring, Maryland, and I had noticed a Brach's truck parked near 8202 New Hampshire.

I went to this individual who operated the truck and asked him if he would like to sell his candy at the Fort Meade Commissary.

"He, who identified himself as Joe Miller, owner of the Jay Bee Distributing Company, advised me that he had been trying to deal with this commissary, but couldn't.

"At this time, it appeared to me that Miller's business was in poor financial condition. I set up a meeting between Miller and (the Commissary Officer) and subsequent to that meeting, Miller started selling his products to the Fort Meade Commissary.

"During the next four months, I introduced Miller to other Commissary Officers at social functions.

"During this period I was Commissary Specialist, Second Army Headquarters, at Fort Meade, and had nothing to do with buying or selling for the commissaries.

"Miller began doing business with other commissaries. I did not force or ask any Commissary Officers to deal with Miller, nor did I appear at any of the appointments that Miller had with Commissary Officers.

"After the above noted four months, I was invited to Miller's brother-in-law's home, Morris, last name unknown, a

C.P.A., who resides in Baltimore, by Miller. At this home, Morris suggested, in Miller's presence, that they would like to bring me into the Jay Bee Distributing Company and that my share would be two per cent of gross sales. Miller agreed to this. I told them that I would be happy to join them in this business arrangement and I saw nothing wrong with it.

"I made no promises that the business would increase at military establishments, especially since I was not in the position to do so.

"The reason why they took me into the business was because they were appreciative of me introducing Miller to Commissary Officers, and thereby Miller was able to put his business on its feet.

"Thereafter, Miller paid me one hundred dollars a month until April, 1962. Each year, he would also give me two five hundred dollar payments; one payment around May, and the other around June of each year. He has given me no five hundred dollar payment this year. Each one hundred dollar payment has been between the sixth and thirteenth of each month. I believe that I have between three to four thousand dollars due me from this business, that Miller has not paid me, since in my contacts, I have determined that Miller is doing a lot better than he has told me. I have never checked Miller's book. He simply paid me in cash. Miller obtained no financial advantage by my connections with the commissary, and it is to be especially noted that Miller's sales volume has decreased at the Fort Meade Commissary since I have become Commissary Officer due to deletion of certain items.

"In regard to the business, there was no written agreement with Miller or Morris concerning my part-ownership. Miller also continually bothered me about him selling new items to the commissary, some of which I accepted and if they didn't sell at the commissary I would delete. I do not believe that my relationship to the Jay Bee Distributing Company constituted any illegal act by myself.

"I obtained about eight thousand dollars to nine thousand dollars from Miller due to this business relationship."