**UNITED STATES of America, Appellee,**

v.

**David Bernard BARASH, Appellant.**

**No. 459, Docket 30432.**

United States Court of Appeals
Second Circuit.

Argued June 24, 1966.

Decided Aug. 3, 1966.

Louis Bender, New York City, Lloyd A. Hale, New York City, of counsel, for appellant.

Robert L. King, New York City (Robert M. Morgenthau, U. S. Atty. for Southern District of New York; Neal J. Hurwitz, John E. Sprizzo, Asst. U. S. Attys., of counsel), for appellee.

Before MOORE, FRIENDLY and FEINBERG, Circuit Judges.

FRIENDLY, Circuit Judge:

A grand jury in the District Court for the Southern District of New York returned a rather confusing 32 count indictment against David Bernard Barash, a certified public accountant and attorney, relating to improper payments to

internal revenue agents in connection with their office audit examinations of income tax returns of Barash's clients. Counts 1–12 charged him with giving money to Agents Clyne, Montello and DeSibio in 1960, 1961, 1962 and on January 18, 1963, with intent to influence their official acts in violation of 18 U.S. C. § 201, and counts 13–16 charged him with gifts to Agents Clyne, Montello, Wolf and an agent subsequently identified as Coady for a similar purpose later in 1963 in violation of 18 U.S.C. § 201 (b) as the statute now stands.[1] Counts 17–20 charged him with making the same gifts alleged in counts 13–16 for and because of the agents' official duties, in violation of 18 U.S.C. § 201(f), added in the amendment of October 23, 1962, which became effective 90 days after passage. Finally counts 21–32, which related to the same payments alleged in counts 1–12, charged him with aiding and abetting Clyne, Montello and DeSibio in receiving illegal fees for the performance of their duties in violation of 26 U.S.C. § 7214(a) (2). After trial before Judge MacMahon and a jury, Barash was acquitted on the six counts relating to Montello and Wolf but found guilty on the twenty-six (involving thirteen transactions) which concerned Clyne, DeSibio and Coady. He was sentenced to imprisonment of a year and a day on each count, the sentences to run concurrently.

The Government's case was presented through the agents. Clyne and DeSibio had pleaded guilty to offenses charged in the instant indictment and to others; Coady had been operating in an undercover capacity. Clyne, who was the receiving party in ten of the thirteen incidents resulting in convictions, testified to a pattern of conduct substantially as follows: Barash would inform Clyne of clients who had received "call-in" letters instructing them to appear for audit of their returns before the group of agents

that included Clyne. In violation of office procedures Clyne would obtain the returns and related papers from his supervisor's file and assign the audits to himself. Barash would suggest relatively small disallowances in unsubstantiated deductions for travel and entertainment expenses, and would offer Clyne compensation for thus passing the returns. When Clyne obliged, Barash would make payments ranging from $20 to $50 per return. DeSibio, who figured in two incidents in 1961, gave similar testimony except that he did not say Barash had taken the initiative in getting the audits assigned to him. Coady testified that in July 1963 Barash, after being introduced to him by a fellow-employee, Jeanne Lupescu, asked if Coady could get a tax return from the files and assign it to himself; when Coady answered in the affirmative, Barash furnished him the details, requested a "no-change" report the next day and, on Coady's assent, said he had an envelope for him and shortly returned with one containing $50.

The theory of the defense was that Clyne and DeSibio had implicated Barash in order to get favorable consideration as to their sentences for other crimes, and that Coady had distorted an incident that was wholly innocent. Barash denied offering anything to the agents in connection with the audits, although he admitted having given Christmas presents of $25 or $50 to Clyne in 1960, 1961 and 1962 and making a $50 payment in January 1963, having DeSibio to lunch, and having made a $50 gift to Coady in appreciation of the latter's expediting the audit and in response to a remark, admittedly made by Coady, that he was soon going off to Marine Corps summer camp. Barash also testified as to pressure from Clyne, beginning with a mild suggestion on an audit in the spring of 1961 and mounting in intensity thereafter,[2] all of which

---

1. So far as concerns the offense of bribery, the amendment effected by 76 Stat. 1119 (1962) was only a rewording and made no change of substance.

2. Specifically Barash testified that in November 1961, on the audit of the returns mentioned in counts 11 and 31, Clyne refused to look at his substantiation, say-

Clyne had denied on cross-examination, and was again to deny on rebuttal.

■■ Barash raises many claims of trial error;[3] the Government defends the judge's rulings and instructions and argues in the alternative that any error can be quarantined to particular counts and is immaterial in view of the concurrent sentences. See Lawn v. United States, 355 U.S. 339, 359, 362, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958). However, as Judge Clark made clear for us, the doctrine of the one good count is not a fetish; we must inquire whether "the nature of the error committed below or other circumstances suggest that the accused might have received a longer sentence than otherwise would have been imposed, or that he has been prejudiced by the results of the proceedings." United States v. Hines, 256 F.2d 561, 563 (2 Cir. 1958).

■■ We begin with the two counts relating to Coady, the single agent whose slate was clean and whose testimony may thus have carried particular weight. Cross-examination had emphasized that Barash had given him $50 only after the audit had been concluded and therefore could not have intended the payment to influence any action on his part. The Government sought to counter this by asking Coady on redirect whether prior acts had led him to believe he would be paid. He mentioned three— the suggestion that he pull the return and assign it to himself, the request for a no-change without substantiation, and, over objection, the introduction of Ba-

rash to him by Jeanne Lupescu "because Miss Lupescu had never introduced me to anyone except someone who was going to pay me off." Granted that a promise to pay can be conveyed only by a wink of the eye, it is questionable whether even if all this evidence were properly received, the Government made out enough to go to the jury on the bribery count with respect to Coady. But the testimony as to Lupescu should not have been admitted. Its hearsay nature, which would have been obvious if Coady had said Lupescu had told him that Barash had previously paid her or other agents and thus was an accountant of the paying kind, was not removed because she conveyed her meaning without the use of words. The guiding principle was stated long ago by Baron Parke in the leading case of Wright v. Tatham, 7 Ad. & E. 313, 388–389, 112 Eng.Rep. 488, 516–17 (1837):

> " * * * proof of a particular fact which is not of itself a matter in issue, but which is relevant only as implying a statement or opinion of a third person on the matter in issue, is inadmissible in all cases where such a statement or opinion not on oath would be of itself inadmissible."

See Morgan, Hearsay Dangers and the Application of the Hearsay Concept, 62 Harv.L.Rev. 177, 190–192 (1948); McCormick, Evidence § 229 (1954), and cases cited. The Government, not seriously challenging this, argues that the evidence was nevertheless admissible since, without regard to the truth of the implicit assertion, it showed that when

---

ing that unless he were paid from $100 to $200 per audit, Barash would never get a case approved in Clyne's group and Clyne would "louse" him up in other groups; and in the summer of 1962, Clyne said "You cut your throat in this particular group, and as far as I am concerned, you may have cut it in other groups."

3. An additional claim, that a payor to an internal revenue officer cannot be an aider and abettor of the latter's violation of 26 U.S.C. § 7214(a), is foreclosed by United States v. Kenner, 354 F.2d 780, 785 (2 Cir. 1965), cert. denied, 383 U.S.

958, 86 S.Ct. 1223, 16 L.Ed.2d 301 (1966). On its facts the Kenner decision would also rule out a claim that the Government may not proceed against a payor both as a principal under 18 U.S.C. § 201 and as an aider and abettor of a violation of 26 U.S.C. § 7214(a). The point, however, was not raised or discussed in Kenner, and has likewise not been raised in this case. We thus have no occasion to consider whether Milanovich v. United States, 365 U.S. 551, 81 S.Ct. 728, 5 L.Ed.2d 773 (1961), is applicable to offenses such as those here at issue.

Coady dealt with Barash, he expected to be paid. It is true enough that evidence admissible for one purpose is not rendered inadmissible "because it does not satisfy the rules applicable to it in some other capacity and because the jury might improperly consider it in the latter capacity," and that under such circumstances the opponent of the evidence will not prevail by interposing a general objection and is entitled only to a limiting instruction on timely request. 1 Wigmore, Evidence § 13, at 300 (3d ed. 1940); Malatkofski v. United States, 179 F.2d 905, 914 (1 Cir. 1950); United States v. Smith, 283 F.2d 760, 764 (2 Cir. 1960), cert. denied, 365 U.S. 851, 81 S.Ct. 815, 5 L.Ed.2d 815 (1961); United States v. Mont, 306 F.2d 412, 415–416 (2 Cir.), cert. denied, 371 U.S. 935, 83 S.Ct. 310, 9 L.Ed.2d 272 (1962). But here Coady's state of mind was irrelevant unless induced by Barash, a fact as to which the Lupescu story was hearsay; it was thus inadmissible for any purpose. Since the evidence was highly material and the jury cannot realistically be supposed to have considered it only in relation to the bribery count, the convictions on both Coady counts would have to be reversed if they stood alone.[4]

■ Another error occurred in the course of cross-examination of Clyne. When defense counsel asked if he had ever threatened Barash, Clyne answered in the negative. Counsel then proceeded to cross-examine on the basis of tape recordings, furnished to him by the Government, which Coady had made of a "bull-session" at a hotel between himself, Clyne and another corrupt agent, wherein Clyne frankly revealed his prac-

tice of putting pressure on accountants to pay off. In sharp contradiction of what Clyne had just testified and in support of what Barash was later to testify, counsel developed, without objection, that Clyne boasted of having told Barash he was "getting away with murder"; that on discovering Barash was trying to have some audits done without paying off, Clyne told him he had cut his throat in Clyne's group; that he complained of how in another case Barash had beaten him out of fifty dollars,[5] and on this or another occasion Clyne had asked $150 but got only $100; and that he had compared Barash unfavorably with Eugene Kenner, see 354 F.2d 780, who "when he comes in on a case, you never have to ask him." Inexplicably a question whether Clyne remembered having told Coady "you get your money's worth with Gene Kenner; you'll get robbed * *," triggered an objection. The judge sustained this, saying, in the presence of the jury, that he had been waiting for it all afternoon and that if the Assistant United States Attorney had objected earlier, "We might have saved an awful lot of time." Defense counsel then asked whether Clyne told Coady "about a particular case that you had where you set the taxpayer up by being very tough on the audit. * * *" At this point the judge asked counsel to approach the bench, said the court had been very patient with him all afternoon, admonished that the tape could be used only for impeachment, and concluded "you are needlessly prolonging this cross-examination by going into all this stuff and you are not using it for the purpose of impeachment. Now, cut it out!"[6]

---

4. We therefore need not consider defendant's further complaint as to the charge on entrapment by Coady. Although what the judge said as to burden of proof was indeed in conflict with our decisions in United States v. Sherman, 200 F.2d 880, 882–883 (2 Cir. 1952), and United States v. Pugliese, 346 F.2d 861, 862–863 (2 Cir. 1965), it is questionable whether there was any showing of inducement sufficient to raise the issue. Cf. United

States v. Riley, 363 F.2d 955 (2 Cir. 1966).

5. "Throat" and "dollars" were preceded by an adjective that in former days would have been characterized as "unprintable."

6. When Government counsel returned to the subject on redirect and asked Clyne what he meant by saying he made a

Impeachment was the precise enterprise in which defense counsel had been properly engaging, and to good effect. Clyne had denied ever having any trouble with Barash, ever trying to get money from him, ever saying Barash would be subjected to delays, and ever stating that Barash had cut his own throat by failing to pay an agent in the group. Quite apart from possible relevancy on the issue of intent to bribe, Clyne's making of unsuccessful threats and his dislike of Barash were pertinent on the score of bias, and self-contradiction could properly be shown. 3 Wigmore, Evidence §§ 1021, 1022. Indeed, so far as concerns cross-examination as distinguished from extrinsic proof, impeachment as to prior inconsistent statements is proper even with respect to "collateral" matters "which the witness has testified to on direct or cross." McCormick, Evidence § 36; 3 Wigmore, Evidence § 1023. For the defense to establish that Clyne had lied about not making threats would have an importance transcending that particular issue; the jury might well have concluded that, having lied on one subject, he had lied on all.

If the judge had followed his own bent and prevented any cross-examination as to the tapes, the convictions on the twenty counts relating to Clyne would surely have to be reversed. However, due to the United States Attorney's lack of objection, defense counsel was able to get a large amount of the recordings before the jury—enough to include the point in his summation. Under such circumstances we would normally decline to entertain a claim of erroneous exclusion of evidence in the absence of an offer of proof that would enable us to determine whether the evidence was relevant and more than cumulative. See Wigmore, Evidence § 20, at 357 n. 6; F.R.Civ.P. 43(c); Price v. United States, 68 F.2d 133, 134–135 (5 Cir.), cert. denied, 292 U.S. 632, 54 S.Ct. 640, 78 L.Ed. 1486 (1934); Davis v. R. K. O. Radio Pictures, Inc., 191 F.2d 901, 903–904 (8 Cir. 1951). But we are not disposed to be thus insistent when an attorney who, while pursuing an appropriate line of cross-examination in a criminal trial, has been curtly commanded to "cut it out." Moreover, the judge's remarks on sustaining the first objection and on rebuttal, see fn. 6, in effect instructed the jury to disregard the impeaching evidence that had already been elicited.

We also think the charge was in error, in two respects. Although the instruction that only a threat of death or serious bodily injury would make out the defense of duress appears correct enough, cf. D'Aquino v. United States, 192 F.2d 338, 358–359 (9 Cir.), cert. denied, 343 U.S. 935, 72 S.Ct. 772, 96 L.Ed. 1343 (1951); ALI, Model Penal Code § 2.09 (Proposed Official Draft 1962), that was only part of the story since Barash had also requested instructions as to the bearing of threats of economic harm on the intent required for conviction. This court has recently observed that "The intent to influence, accompanying the corrupt giving or accepting of something of value, is an essential element" of the offense of bribery defined in 18 U.S.C. § 201(b), United States v. Irwin, 354 F.2d 192, 197 (2 Cir. 1965), cert. denied, 383 U.S. 967, 86 S.Ct. 1272, 16 L.Ed.2d 308 (1966). We think that if a government officer threatens serious economic loss unless paid for giving a citizen his due, the

"charge" with respect to a return, the judge interrupted and "sustained" his own objection, saying "I have told both of you, and I will now charge the jury—maybe I will get it home to counsel—that even if he did charge, even if he did demand the money, that would not constitute an offense as charged unless he put the defendant in serious threat of bodily injury or death. Now, that is the law. So let us have no more of this wandering all over Robinson's barn on the business of whether he charged or whether he asked for it. That is of no moment." Defense counsel excepted. Irrespective of whether this is "the law" the judge's remarks improperly ignored and told the jury to ignore the testimony as impeachment.

latter is entitled to have the jury consider this, not as a complete defense like duress but as bearing on the specific intent required for the commission of bribery.[7] Cf. United States v. Miller, 340 F.2d 421, 425 (4 Cir. 1965). While it is arguable that this is also true with respect to giving gratuities under 18 U.S.C. § 201(f),[8] or to being an accessory to the receipts prohibited by 26 U.S.C. § 7214(a), offenses which have no requirement of specific intent, see United States v. Irwin, supra, 354 F.2d at 197, and carry a significantly lower punishment, we incline to the view that as to these offenses economic pressure is irrelevant.

■■■■ The other error also relates to the bribery counts. After correctly instructing that the Government must prove "money was offered or promised or given knowingly and wilfully with a corrupt intent to influence" the employee, and that this may be proved not only by what was said by the accused "but also from his acts and conduct and the circumstances and reasonable inferences to be drawn from them," the judge went on to say:

"It is reasonable to infer that a person ordinarily intends the natural and probable consequences of acts knowingly done. So unless the contrary appears from the evidence, you may draw an inference that the defendant intended the natural consequences which one standing in his circumstances and possessing his knowledge should reasonably have expected from any of his acts which he knowingly did." [9]

He continued that if the jury found "circumstances of secrecy or intrigue or of the deviousness or of the use of cash or attempts to conceal the real nature of the acts or transactions," it might consider these as bearing on the defendant's criminal intent.

Despite its ancient vintage, see Agnew v. United States, 165 U.S. 36, 53, 17 S.Ct. 235, 41 L.Ed. 624 (1897), utterance of the quoted platitude serves no useful purpose, since insofar as the statement has logical validity the jury would know it anyhow; more important, in a bribery case it creates a serious risk that the jury might think the Government's burden of showing the required specific intent could be met by proof of payment alone "unless the contrary appears from the evidence"—presumably evidence the defense would have to present. Many courts of appeals ' have looked askance on such an instruction in criminal trials, and some decisions have reversed because of its use, Bloch v. United States, 221 F.2d 786, 788–789 (9 Cir. 1955); Chappell v. United States, 270 F.2d 274, 279 (9 Cir. 1959); Mann v. United States, 319 F.2d 404, 407–410 (5

---

**7.** The statute, 18 U.S.C. § 201, provides:
"(b) Whoever, directly or indirectly, corruptly gives, offers or promises anything of value to any public official * * * with intent—
(1) to influence any official act; or
(2) to influence such public official * * * to commit or aid in committing, or collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or
(3) to induce such public official * * * to do or omit to do any act in violation of his lawful duty, * * *.
Shall be fined not more than $20,000 or three times the monetary equivalent of the thing of value, whichever is greater, or imprisoned for not more than fifteen years, or both. * * * *"

The case put would plainly not come under subdivisions (2) or (3) and a jury could conclude that a payment solely to eliminate a roadblock to what a citizen is entitled is not to "influence" any official act.

**8.** "(f) Whoever, otherwise than as provided by law for the proper discharge of official duty, directly or indirectly gives, offers, or promises anything of value to any public official, former public official, or person selected to be a public official, for or because of any official act performed or to be performed by such public official, former public official, or person selected to be a public official * * *
Shall be fined not more than $10,000 or imprisoned for not more than two years, or both."

**9.** Due exception to this was taken.

Cir. 1963), cert. denied, 375 U.S. 986, 84 S.Ct. 520, 11 L.Ed.2d 474 (1964). Although others have held reversal was not required when the instruction as a whole sufficiently insured against the jury's being misled, Sherwin v. United States, 320 F.2d 137, 148–151 (9 Cir. 1963), cert. denied, 375 U.S. 964, 84 S.Ct. 481, 11 L.Ed.2d 420 (1964); Estes v. United States, 335 F.2d 609, 615–617 (5 Cir. 1964), cert. denied, 379 U.S. 964, 85 S.Ct. 656, 13 L.Ed.2d 559 (1965); United States v. Denton, 336 F.2d 785, 788 (6 Cir. 1964); United States v. Releford, 352 F.2d 36, 40 (6 Cir. 1965), cert. denied, 382 U.S. 984, 86 S.Ct. 562, 15 L.Ed.2d 562 (1966), we are not satisfied that was the case here. On the contrary, when this instruction was combined with the charge on duress and the judge's observation that "One of the purposes of the bribery laws is to nip corruption in the bud, and citizens are obliged in such circumstances not to go along with a crime, but to complain about it to the proper authorities," the jury could well have thought that the Government satisfied its burden under the bribery counts by proof of payment alone.

█ It follows that the convictions on all the bribery counts, 1–6, 8–12, 14 and 16, are subject to reversal for the last mentioned error in the charge; that the convictions on the Clyne bribery counts relating to payments after threats of serious economic harm, namely, 2, 11, 12 and 14, are further subject to reversal for failure to instruct that the jury could consider threats of this as bearing on specific intent to the ex-

tent indicated above; that the convictions on all the Clyne counts, namely, 1–6, 9, 11, 12, 14, 18, 21–26, 29, 31 and 32, are subject to reversal for erroneous restriction of cross-examination; and that the convictions on the Coady counts, 16 and 20, are subject to reversal for the erroneous admission of the statement concerning Lupescu. This leaves only two counts, 28 and 30, charging Barash with aiding and abetting DeSibio in the receipt of two payments of $25. We are dealing here with an attorney and certified public accountant of hitherto unblemished reputation, vouched for, among others, by the Surrogate of Westchester County, a Justice of the Supreme Court of New York, and the County Executive of Westchester. We are far from being certain that the restriction and deprecation of the impeachment of Clyne, the chief Government witness, and the admission of the Lupescu hearsay statement in the testimony of Coady, the undercover agent, did not have a spill-over effect on the DeSibio counts; that the jury might not have exercised its prerogative of leniency if these charges alone had been before it; or that the judge would have given the same sentence for convictions on these two aiding and abetting counts as he did for those on the twenty-six, including convictions for bribery. Applying the rule of United States v. Hines, supra, 256 F.2d 561, we think our duty to "require such further proceedings to be had as may be just under the circumstances," 28 U.S.C. § 2106, demands a reversal and a remand for a new trial.[10]

Reversed.

10. We may as well express our views as to one matter that will probably arise on such a trial. Clyne was allowed to state, over objection, that in August 1960 Barash had arranged for him to receive ten "call-in" letters, and that he obtained the returns and related papers, assigned the audits to himself, went to Barash's office for the audits and, after completing them, received $225. The objection was that since only three of these returns figured

in the indictment—the Government having been unable to identify the others—the prosecution had been improperly allowed to introduce evidence of other crimes. As explained in our recent opinion in United States v. Bozza, 365 F.2d 206, 212–214 (1966), the rule applied on this subject in the federal courts does not require any such artificial truncation of a single piece of evidence.